

**SO ORDERED.**
**SIGNED 12th day of June, 2025**

**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.**
**PLEASE SEE DOCKET FOR ENTRY DATE.**

*Randal S. Mashburn*
**Randal S. Mashburn**
**Chief U.S. Bankruptcy Judge**

# IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Judson Wheeler Phillips, | ) | Case No. 3:23-bk-03350 |
| | ) | Chapter 7 |
| Debtor. | ) | Judge Randal S. Mashburn |
| _____ | ) | |
| | | |
| Diana Mey, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 3:23-ap-90125 |
| | ) | |
| Judson Wheeler Phillips, | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| John Preston Thompson, | ) | Case No. 3:23-bk-04259 |
| | ) | Chapter 7 |
| Debtor. | ) | Judge Randal S. Mashburn |
| _____ | ) | |
| | | |
| Diana Mey, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 3:24-ap-90016 |
| | ) | |
| John Preston Thompson, | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION

A self-described consumer advocate seeks to recast $1.5 million in statutory damages and attorneys' fees based on violations of strict liability laws regulating the use of "robocalls" into a claim for "willful and malicious injury" pursuant to 11 U.S.C. § 523(a)(6). She argues that the callers intended to commit fraud and consequently intended her harm. However, the standard for satisfying § 523(a)(6) is quite high, with the focus on intent to cause the injury at issue. In this case, it would require proof that the mere act of placing unwanted robocalls was intended or substantially certain to cause harm. Evidence of intent to commit fraud, engaging in a fraudulent scheme, or generalized business misconduct does not prove that the debtor intended to cause the injury reflected in the judgment debt. Because the exacting standard of § 523(a)(6) was not met, the plaintiff's claim that the debt be declared nondischargeable is denied.

As an alternative theory, the plaintiff seeks to bar the debtors' discharges under 11 U.S.C § 727(a)(4)(A) due to omissions in their sworn bankruptcy filings. In that regard, the plaintiff is partially successful, satisfying her burden as to one debtor but not as to the other.

## I.    STATEMENT OF FACTS

Plaintiff Diana Mey obtained a massive judgment by default against defendants Judson Phillips and Preston Thompson (the "Debtors" or the "Defendants") from a West Virginia court. The Defendants were found individually liable for violations of federal and state telemarketing laws pursuant to a finding that the companies behind the calls were the Defendants' alter egos.

Ms. Mey's pursuit of the Defendants was stalled when they filed bankruptcy. She now seeks to except the debt from discharge pursuant to

§ 523(a)(6) by characterizing the debt for statutory violations requiring no intent as "willful and malicious" based on the callers' alleged intent to commit fraud, even though she could not pursue an exception to discharge under § 523(a)(2) because she suffered no loss from fraud.

This Court previously held, in the context of a summary judgment motion, that the judgment alone did not satisfy the requirements of § 523(a)(6), so the Court conducted a trial on that claim as well as on Ms. Mey's claims against the Defendants for denial of discharge pursuant to § 727(a)(4)(A).

### A. The West Virginia Litigation

Ms. Mey is involved in consumer advocacy and concerned with, among other things, telemarketing calls. She is familiar with state and federal laws regulating the use of automated dialing and prohibiting calls to phone numbers on the "Do Not Call" Registry for the purpose of soliciting business. She began suing companies that violated the Telephone Consumer Protection Act ("TCPA") at least 25 years ago, and she has filed multiple lawsuits since.

In 2019, Ms. Mey filed suit against Tristar Consumer Law, multiple other corporate entities, and several individuals, including Mr. Phillips and Mr. Thompson. Her suit was before the United States District Court for the Northern District of West Virginia, styled *Mey v. Castle Law Group, PC, et al.*, and assigned case number 5:19-cv-185 (the "West Virginia Court" and "West Virginia Litigation," respectively).

Ms. Mey claimed the defendants in the West Virginia Litigation had violated several provisions of the TCPA and its state counterpart, the West Virginia Consumer Credit and Protection Act ("WVCCPA"). She also alleged that the individual defendants and their businesses were acting as a joint enterprise and as alter egos of one another in carrying out abusive and deceptive telemarketing schemes.

## B. Default Sanction and Alter Ego Finding

Mr. Thompson, Mr. Phillips and other defendants participated in the West Virginia Litigation, but in a manner that the West Virginia Court found not to be in good faith. On January 4, 2022, the West Virginia Court entered an order granting Ms. Mey's motion for sanctions for discovery abuse, thereby striking the defendants' pleadings and defenses as a sanction. (Ex. 1045.)

After entry of the January 4, 2022, order, Ms. Mey discovered additional information that had not been disclosed in discovery, and in February 2022, she filed a renewed motion for sanctions and request for entry of default judgment.

The West Virginia Court granted Ms. Mey's renewed motion for sanctions. ("Default Sanctions Order"; Ex. 1047.) Although this order is titled "Order Granting Default Judgment," it includes no finding of liability for any claim or award of damages. By itself, it creates no debt owed to Ms. Mey by the Defendants. Instead, its focus was on the discovery abuse, and it is more akin to an entry of default rather than a default judgment. In the Default Sanctions Order, the West Virginia Court found bad faith by the defendants based on a continued pattern of non-disclosures, and it granted default judgment as a sanction for the discovery abuse. The West Virginia Court reserved the determination of the number of statutory violations and appropriate damages.

The Default Sanctions Order is most relevant because the West Virginia Court made an alter ego finding that Ms. Mey argues should apply in this case. The West Virginia Court noted that "[b]y virtue of the Court's [January 4] ruling, Defendants[1] are deemed to have engaged in these schemes against Ms. Mey in joint enterprise and as alter egos of one another." (*Id.* at 7.)

---

[1] The defendants to whom the West Virginia Court referred include the debtor Defendants in this case and the additional defendants Steve Huffman, Music City Ventures, and Capitol Compliance Group, Co.

## C. The Judgment and Related Attorneys' Fee Awards

On July 5, 2022, after entry of the Default Sanctions Order, the West Virginia Court entered an order titled "Order Granting Judgment," hereinafter referred to simply as the "Judgment." (Ex. 1190.) This is the only order entered by the West Virginia Court that addresses the Defendants' liability and damages. The Judgment was entered against Mr. Phillips and Mr. Thompson, and other defendants in that litigation: Steve Huffman, Music City Ventures, and Capitol Compliance Group, Co. The Judgment includes a finding that American Consumer Rights Organization ("ACRO") was also the defendants' alter ego and the ultimate entity on whose behalf the calls were made.

The West Virginia Court found that calls to Ms. Mey violated the TCPA 180 times, with some calls accounting for multiple violations. The Judgment only refers specifically to 47 C.F.R. § 64.1200(d). However, the Court clearly adopted Ms. Mey's calculation of 180 statutory violations in her memorandum of law in support of her motion for entry of default judgment. (Ex. 1201.) By reference, the Judgment implicitly includes the finding that the callers violated the TCPA by (i) initiating calls to Ms. Mey's cellular telephone line by using an automated dialing system (47 U.S.C. § 227(b)(1)(A)); (ii) initiating calls to Ms. Mey's residential line using an artificial or prerecorded voice without consent (47 U.S.C. § 227(b)(1)(B)); (iii) initiating more than one call to Ms. Mey in a 12-month period while her number was on the National Do Not Call registry (47 U.S.C. § 227(c)); and (iv) the callers failing to clearly identify themselves and failing to produce their Do Not Call policies when requested (47 C.F.R. § 64.1200(d)(4) and (1)). These are all strict liability statutes that do not require proof of intent or any proof about the content of the calls.

The West Virginia Court awarded statutory penalties of $500 per violation under the TCPA, for a total of $90,000, which the court then trebled based on a finding that the violations were willful and knowing. (This Court

previously held that the "willful and knowing" standard under the TCPA is not the equivalent of the "willful and malicious injury" standard under § 523(a)(6) of the Bankruptcy Code. *See* Adv. Pro. No. 24-90016, Docs. 21, 22.) The total TCPA penalty award was $270,000.

The West Virginia Court also found that 104 calls violated the WVCCPA, specifically stating:

> As pled, all the calls were made after Ms. Mey's listing on the Do Not Call registry, and therefore, each one violated W.Va. Code § 46A-6F-601 (a)(3), "initiat[ing] an outbound call to a person when that person previously has stated that he or she does not wish to receive an outbound call made by or on behalf of the telemarketer whose goods or services are being offered".

(Ex. 1190 at 7.) For the WVCCPA damages, the West Virginia Court awarded the maximum penalty of $5,373.09 per call for a total penalty award of $558,801.36. The court found that the maximum penalty was justified based on the following findings:

> All of the following allegations are established: Defendants phoned Ms. Mey repeatedly despite her registration on the Do Not Call registry; Defendants continued to call Ms. Mey after at least 9 attempts to stop their calling; the calls were misleading; agents on some occasions became belligerent and hung up on Ms. Mey; agents made repetitive calls within an hour; and calls continued over a span of three years and even after litigation in this case was filed.

(*Id.* at 10.)

For ease of reference, the calls are sometimes referred to hereinafter as "robocalls," even though the calls were found to have violated the statutes in multiple ways, primarily by being directed to Ms. Mey's phone numbers despite the numbers being registered on the national Do Not Call registry.

After entry of the Judgment, the West Virginia Court entered two orders awarding Ms. Mey her attorneys' fees under the WVCCPA: one for pre-appeal fees of $448,595 and another for post-appeal fees of $200,965.56.

In total, the West Virginia Court awarded Ms. Mey damages and attorneys' fees of $1,478,361.92 jointly and severally against Mr. Phillips, Mr. Thompson, and the other defendants included in the Judgment.

### D. Debtors' Bankruptcy Cases and Ms. Mey's Adversary Proceedings

On September 15, 2023, Mr. Phillips filed a petition for relief under Chapter 7 of the Bankruptcy Code in this Court, and Mr. Thompson followed suit on November 17, 2023.

Ms. Mey commenced these adversary proceedings against Defendants, asserting claims that the Judgment debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(6) and that the Defendants should be denied discharge pursuant to 11 U.S.C. § 727(a)(4)(A) because they failed to provide full and complete information to questions on their statements of financial affairs.

Ms. Mey filed a motion for partial summary judgment in which she sought a ruling that collateral estoppel barred Mr. Thompson from contesting factual findings by the West Virginia Court that she argued established that the Judgment debt is nondischargeable pursuant to § 523(a)(6).[2] She did not seek a ruling as to the collateral estoppel effect of any particular facts, but instead she asked the Court to make the ultimate determination that the Judgment was nondischargeable based only on the Judgment itself. The Court denied her

---

[2] Ms. Mey filed her motion relating to the collateral estoppel effect of the Judgment only in the adversary proceeding against Mr. Thompson, which was then proceeding at a faster pace than her adversary proceeding against Mr. Phillips. The Court ruled on her motion prior to the Court conducting an initial pretrial conference in Mr. Phillips' adversary proceeding. Ms. Mey opted not to repeat her motion in Mr. Phillips' adversary proceeding.

motion because it found no identity of issues between the strict statutory violations found by the West Virginia Court and § 523(a)(6), which requires that a debt be "for willful and malicious injury by the debtor." (Adv. Pro. No. 24-90016, Docs. 21-22.) The TCPA and WVCCPA do not require either an injury or that it be "willful and malicious," as defined for § 523(a)(6).

Because the § 523(a)(6) claims were based on the same facts and law, the Court consolidated the two adversary proceedings for trial.

### E. Trial Proof Regarding the Calls

At trial, Ms. Mey introduced extensive evidence about the calls, as well as documentation purporting to show that the Defendants or their alter egos were engaged in similar fraudulent activity involving other parties in other locations.

In connection with her consumer advocacy, Ms. Mey has technology to record telemarketing calls and voicemails. She does not just hang up on unwanted calls but often engages with callers to identify the caller and obtain information about their compliance, or lack thereof, with telemarketing laws. Her goal with caller engagement is to obtain evidence for a future lawsuit, and her stated goal for the lawsuits is to deter continued violations of the TCPA and equivalent state statutes. Of course, when she is successful in this pursuit, the result can be substantial damage awards, including separate damages for violation of both state and federal statutes, treble damages and/or maximum penalties, and attorneys' fees.

In March 2018, Ms. Mey began receiving calls from persons representing themselves as being associated with Mr. Phillips' company, Tristar Consumer Law, and offering debt relief services, including "eliminating" all credit card debt.

An example of what sometimes occurred is reflected in one of the early calls on March 6, 2018, from a person calling himself "Tom Garden." Ms. Mey engaged with the caller, feigned interest, and provided credit card and personal information, including her email and billing addresses and her mother's maiden name.

During this call, the caller represented that he had checked her credit card balance, and he stated that Ms Mey was approved for elimination of up to approximately twice the amount of her credit card debt. He stated the fee for their services would be $4,698, which would be charged to her credit card and then eliminated with the rest of her debt, so that the credit card company paid the fee, not Ms. Mey. He advised her that she did not need to pay any more than the minimum payments on her credit card for the next three months, and she need not make any more payments after that. He also assured her that although their services might initially harm her credit rating, they would ultimately improve her rating by the elimination of debt and improvement of debt to credit ratio. The call lasted approximately 32 minutes, and Ms. Mey consented to follow up calls.

When Ms. Mey received a follow up call that day from a different caller about Tristar's "debt validation program," she probed for information about the caller, the company he was with (Tristar Consumer Group), and its affiliation with Tristar Consumer Law. The caller stated that Tristar Consumer Group was a processing center for the law firm.[3] Ms. Mey asked if they were affiliated with her credit card company as the first caller had represented. The second caller denied any affiliation and said that the original caller, who was with a call center, should not have told her that because it was not true.

---

[3] Tristar Consumer Group is an assumed name of Music City Ventures, Inc., which is owned by Mr. Thompson.

During this second call, the caller reminded her of the $4,698 fee, that she was only responsible for paying three months of minimum payments on her credit card, that she was not responsible for making any additional payments on the card, and that the card would go into default and be listed as a "bad account" on her credit report. He then confirmed her understanding of those terms. He further confirmed her understanding that Tristar does not pay off the credit card or settle for a lesser amount, but that Tristar would dispute the debt with credit bureaus to get it removed so she would no longer be responsible for paying off the card.

The caller said he would send Ms. Mey a contract by email for her to review and sign. When Ms. Mey asked for information about the original caller (i.e., the call center) including contact information, the tone of the call deteriorated. This second caller and another person who came on the line both refused to provide the contact information, but said they would direct the call center to call Ms. Mey back. In turn, Ms. Mey threatened suit against Tristar Consumer Group and the call center for violations of the TCPA.

The original caller, "Tom Garden," called Ms. Mey four times that day asking what happened and "what seems to be the problem." In the first two calls, Ms. Mey asked him not to call again, and she cut short and hung up on the last two calls.

Ms. Mey continued to receive calls from Tristar and other companies that Ms. Mey believes were related, even though the proof is unclear on that point since they sometimes offered different debt-related services than what was offered in the original call. The calls continued after Ms. Mey filed the West Virginia Litigation in 2019 and thereafter until April 2021, when Ms. Mey changed her phone number.

The statutory damages in the Judgment related to approximately 104 calls, which were placed over a period of three years. That works out to be an average of two to three calls per month, but, as reflected in the example involving caller "Tom Garden," there were sometimes multiple calls in a short time span.

At trial, Ms. Mey introduced evidence regarding approximately 125 calls, including her call recordings and notes. The calls varied in length and in Ms. Mey's participation level.

Some calls were similar to those described above in which Ms. Mey first feigned interest and then asked for information to support future TCPA claims. Ms. Mey consented to some of the follow-up calls to obtain such information. She used at least three pseudonyms when communicating with the callers. Typically, when Ms. Mey received multiple calls in one day, most of the calls were follow-up calls made with Ms. Mey's express consent or implied consent based on her feigned interest. Of the approximately 125 calls included in Ms. Mey's trial proof, approximately 25 were follow-up calls made with Ms. Mey's express or implied consent.

Some of the calls did not extend beyond automated, pre-recorded messages that were either picked up and recorded by Ms. Mey's technology or answered by Ms. Mey who then quickly hung up.

In many of the calls, Ms. Mey asked callers not to call again.

Ms. Mey did not complete a business transaction with any of the callers or pay the callers or their businesses any money, and she does not allege that she suffered any monetary loss from the calls or the offered debt services.

Ms. Mey argues that the businesses were fraudulent in nature and the callers were calling her for the purpose of committing fraud. She testified that the callers sometimes made false statements about her credit card debt,

including that she was paying high interest and fees, when she knew that she paid off her card balance every month. She also argues the callers sometimes made misleading and confusing statements about their affiliation with her credit card company.

### F. Trial Proof Regarding § 727(a)(4)(A) Claims

Ms. Mey also put on proof at trial in support of her claims that Mr. Phillips and Mr. Thompson should be denied discharge pursuant to § 727(a)(4)(A). To avoid excessive duplication, that proof is addressed in the applicable discussion sections.

## II.   DISCUSSION

Ms. Mey asserts that the Judgment debt should be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(6) and that the Defendants should be denied discharge pursuant to 11 U.S.C. § 727(a)(4)(A).

As to each claim, Ms. Mey bears the burden of proof by a preponderance of the evidence. *See Grogen v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991) (stating that the plaintiff bears the burden of proving the dischargeability exceptions in § 523(a) by a preponderance of the evidence); *Palik v. Sexton* (*In re Sexton*), 342 B.R. 522, 530 (Bankr. N.D. Ohio 2006) (applying the preponderance burden specifically to a § 523(a)(6) claim); *Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 685 (6th Cir. 2000) (stating that the burden of proof for denial of discharge under § 727(a)(4)(A) is preponderance of the evidence).

Exceptions to discharge pursuant to § 523(a) and claims for denial of discharge pursuant to § 727 are both strictly construed against creditors. *Keeley v. Grider*, 590 F. App'x 557, 560 (6th Cir. 2014) (§ 523(a)); *Keeney*, 227 F.3d at 683 (§ 727).

## A. The 11 U.S.C. § 523(a)(6) Claim

11 U.S.C. § 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The injury must be both willful and malicious. *MarketGraphics Research Grp., Inc. v. Berge* (*In re Berge*), 953 F.3d 907, 914 (6th Cir. 2020) (expressly adopting a two-pronged approach where "willful" and "malicious" are separate elements that must be proven). The injury also must be caused by the debtor. *Greer v. Bruce* (*In re Bruce*), 593 B.R. 765, 777 (Bankr. S.D. Ohio 2018) (emphasis added in *In re Bruce*) ("Under this provision, the willful and malicious injury has to be an injury '*by the debtor* to another entity or to the property of another entity[.]'"). Each of these three elements are contested in this case.

At trial, Ms. Mey was required to prove that the debt arising from the Judgment is for an injury that was (1) willful, (2) malicious, and (3) caused by the Debtors.

### 1. Debt and the General Role of "Injury" in the Required Analysis

The debt and "injury" derive from the Judgment. The debt is for violating state and federal statutes by placing robocalls to Ms. Mey's phone numbers that were listed on the Do Not Call registry.

The statutes violated were strict liability statutes for which no injury had to be proven and for which Ms. Mey chose to accept statutory damages rather than prove actual damages. The lack of actual damages is not necessarily fatal to Ms. Mey's claim, however, since statutory damages may constitute a debt for purposes of § 523(a)(6). *See HER, Inc. v. Barlow* (*In re Barlow*), 478 B.R. 320, 333-34 (Bankr. S.D. Ohio 2012) (rejecting plaintiff's argument that actual damages must be shown for § 523(a)(6) and citing cases in which courts have

held that statutory damages arising from willful and malicious injury are nondischargeable under § 523(a)(6)).

Ms. Mey did not attempt to prove any actual injury from the robocalls in her § 523(a)(6) action. To the extent any type of injury can be inferred from the Judgment in this case, it is from the theory that Ms. Mey's receipt of the robocalls may result in an invasion of privacy or could be perceived as harassment. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372, 132 S. Ct. 740, 745, 181 L. Ed. 2d 881 (2012) (quoting TCPA, § 2, ¶ 5, 105 Stat. 2394, note following 47 U.S.C. § 227 (Congressional Findings) (internal quotation marks omitted) (noting that in enacting the TCPA, Congress found that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy").

In this case, Ms. Mey did not argue that the purpose of the calls was to harass or invade her privacy.[4] Instead, she argued that the Defendants intended to injure her by committing fraud if Ms. Mey had responded positively and bought the services offered by the alter ego companies. That distinction is critical in this case. Logically, there would be no profit motive for telemarketers to pursue calls merely for the purpose of harassing or inconveniencing call recipients. Telemarketers make their money from successful sales of whatever product they are selling, even if, with disreputable telemarketers, it involves some fraud or misrepresentation to consummate a sale. But § 523(a)(6) deals with a different type of intent than the more frequently asserted fraud claims under § 523(a)(2). To fit under § 523(a)(6), the goal of the offender must be to cause harm, whereas the goal of the typical fraudster under § 523(a)(2) is to profit financially from any fraud that is committed.

---

[4] Ms. Mey did show that some of the individual callers were belligerent or rude, but she did not tie those actions by low-level call center employees or agents to the Debtors or their alter ego companies and show that rudeness was a corporate directive and not a low-level employee acting outside the scope of employment. Additionally, the Judgment was not based on the content of the calls or any belligerent or rude behavior by the callers.

The flaw in Ms. Mey's case is not a lack of any injury, since an injury may be inferred from the Judgment debt, but a lack of proof of intent to cause any such inferred injury.

## 2. Willfulness

For debt to be excepted from discharge under § 523(a)(6), it must be for a "willful … injury." This standard has been described as "stringent," *Wade v. Girardin* (*In re Girardin*), 366 B.R. 720, 726 (Bankr. W.D. Ky. 2007), and "strict," *Travadia Enterprises, Inc. v. Mitchell* (*In re Mitchell*), 618 B.R. 199, 213 (Bankr. W.D. Ky. 2020). Willfulness requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 977 (1998) (emphasis original). "[D]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at 64.

The willfulness standard has been likened to intentional torts, which "generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'" *Id.* at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964) (emphasis added in *Geiger*). The plaintiff must show that a defendant acted with subjective intent to harm or with substantial certainty that harm would occur. *Berge*, 953 F.3d at 915. Within the Sixth Circuit, this standard is subjective and asks "whether the debtor himself was motivated by a desire to inflict injury." *Id.*.

Since defendants will rarely admit to acting with an intent to injure, intent may be proven with circumstantial evidence. *Id.* ("[I]ntent may be inferred from the circumstances of the injury."); *see also Stephens v. Morrison* (*In re Morrison*), 450 B.R. 734, 750 (Bankr. W.D. Tenn. 2011) (quoting *Ker v. Ker* (*In re Ker*), 365 B.R. 807, 813 (Bankr. S.D. Ohio 2007) (internal quotation marks and citations omitted) ("[T]he bankruptcy court may consider circumstantial

evidence that tends to establish what the debtor must have actually known when taking the injury-producing action.").

### a. Proof of Intent to Defraud

Ms. Mey argues that, through the use of their alter ego companies, "the Defendants engaged in a predatory scheme to bilk consumers out of their money[.]" (Plaintiff's Pretrial Brief, Adv. Pro. No. 24-90016, Doc. 52 at 10.) She argues that the "Defendants were substantially certain they would inflict a willful and malicious injury on Plaintiff by offering misleading debt relief services." (*Id.* at 2.) Even though the Judgment was based on violation of telemarketing statutes under which the act of calling was the lone cause for liability, Ms. Mey argues that the Court should consider for § 523(a)(6) purposes that the underlying purpose of the calls was to commit fraud.

A significant portion of Ms. Mey's trial evidence was submitted to prove that intent.[5] In the vein of where there's smoke, there must be fire, Ms. Mey proffered documentary evidence that her counsel contended showed that the Defendants or their alter ego companies had committed fraud in other similar situations.[6]

For example, Ms. Mey produced nine complaints by other plaintiffs against one or both Defendants and/or one or more of what are alleged to be their companies.[7] Ms. Mey also introduced the Tennessee Board of Professional Responsibility's file regarding Mr. Phillips' attorney disbarment and an

---

[5] It is undisputed that in Ms. Mey's case, fraud was not in fact committed and Ms. Mey was not injured by the allegedly fraudulent debt relief services.

[6] Because this was a bench trial and to streamline the process, defense counsel stipulated to the admission of the documents into evidence with the proviso that there were general objections to the relevance, reliability and hearsay nature of the evidence and the understanding that the Court would reserve judgment as to whether the evidence should be given any weight.

[7] Exs. 1054 – 1057, 1059, 1063, 1193, 1195, 1196.

investigative file from the West Virginia Attorney General.[8]  All of these documents contain statements of what other persons allege the Defendants or their companies did, which Ms. Mey would have the Court accept as true and proof of fraudulent intent in this case.  These allegations and accusations are inadmissible hearsay to the extent offered to show that the Defendants have committed fraud.[9]  *See* Fed. R. Evid. 801, 802.  The Court does not consider the fact that other persons have accused the Defendants or their companies of fraud or other misconduct probative of the Defendants' intent relating to the calls to Ms. Mey.[10]

Ms. Mey also introduced documents from a suit by the Federal Trade Commission (the "FTC") against Mr. Thompson and others, including Music City Ventures, Inc. and ACRO, in the United States District Court for the Middle District of Tennessee (the "FTC Litigation").[11]  As with the documents described above, the complaint, declaration and receiver's report from this action contain inadmissible hearsay.  And regardless of the hearsay problem, the evidence is not instructive about what occurred specifically with Ms. Mey.

---

[8] Exs. 1062 and 1061, respectively.

[9] Ms. Mey argues that the complaints and investigative files are admissible evidence of other crimes, wrongs or acts to show the Defendants' intent pursuant to Fed. R. Evid. 404(b)(2). However, Ms. Mey is still asking the Court to accept hearsay allegations as proof that Defendants committed fraud or other wrongful acts in other contexts.  There is no applicable exception to the rule against hearsay.  Fed. R. Evid. 803.  To the extent the evidence is admissible notwithstanding the hearsay, as Ms. Mey argues, the Court gives it no weight as it is both unreliable and irrelevant.

[10] In addition to containing hearsay, the investigative files have additional evidentiary issues. They may contain letters and sworn statements from Mr. Phillips, but Ms. Mey did not have Mr. Phillips authenticate them during the trial, impeach him about the contents, or point out to the Court how anything in the files was relevant to this case.  It is not the Court's role to sift through files and attempt to find something that might buttress a party's position.  Since no effort was made to demonstrate the importance or materiality of any of that evidence, the Court gives it very little weight.  *See Melton v. Nat'l Dairy LLC*, 705 F. Supp. 2d 1303, 1323 (M.D. Ala. 2010) ("[I]t is not this Court's job to cull through the voluminous record in this case for specific examples [where] Plaintiff gave no pin point cites to identify relevant matters for the Court.").

[11] Exs. 1042 - 1043, 1049 – 1053, 1197.

The more probative evidence from the FTC Litigation is in two orders. The first is a Stipulated Order for Permanent Injunction and Judgment as to Defendant John Preston Thompson. ("FTC Stipulated Order"; Ex. 1053.) Essentially, without admitting the allegations in the FTC's complaint or any specific wrongdoing, Mr. Thompson stipulated to the entry of judgment against him for $17,486,080.85 and to the finding that the judgment satisfies the standard for nondischargeablity pursuant to 11 U.S.C. § 523(a)(2)(A), which generally relates to fraud. Aside from certain specified payments, the judgment was suspended. Mr. Thompson also agreed to certain injunctive terms.

The second order is a Default Final Order for Permanent Injunction and Judgment as to [the Identified Entity] Defendants ("FTC Default Order"; Ex. 1052). The FTC Default Order was entered against Mr. Thompson's company, Music City Ventures, Inc. and ACRO, both of which were determined by the West Virginia Court to be Mr. Thompson's and Mr. Phillips' alter egos, but it was not entered against either individual.

The FTC Default Order, even though not technically addressing the conduct of the Defendants individually, includes significant findings about some of the companies that the West Virginia Court found to be the Defendants' alter egos. By combining the default ramifications of the West Virginia Judgment with the default determinations in the FTC Default Order, and then adding the alter ego finding to make the Defendants individually responsible, one can cobble together circumstantial evidence that the Defendants were involved in fraudulent activities.

Among other things, the FTC Default Order includes findings that the identified entity defendants engaged in deceptive or abusive acts and practices in connection with the advertising, marketing or sale of debt relief services, made numerous false or misleading statements to consumers, failed to disclose material terms and conditions of the marketed services, and generally violated

a host of telemarketing regulations. The FTC Default Order also contains a finding that the defendants operated as a common enterprise. Judgment was entered against the entity defendants for $30,226,160.44, and jointly and severally with Mr. Thompson as to $17,486,080.85 of that amount (i.e., the judgment amount in the FTC Stipulated Order).

Neither the FTC Stipulated Judgment nor the FTC Default Order contain findings about the applicable defendants' intent as opposed to their actions. Further, Ms. Mey has not argued that either order should have a legally preclusive effect in this proceeding.

The false or misleading statements described in the FTC Default Order mirror statements made to Ms. Mey in calls she received. If the FTC orders are probative of anything, it is that companies found by default to be the Defendants' alter egos were found in a different lawsuit to have committed fraud-like wrongs in connection with the same debt relief services offered to Ms. Mey. They are not probative of the companies' intent to cause Ms. Mey injury at the time calls were being made to her two to five years earlier, and not probative as to the debtor Defendants' intent.

Even if the Court were to find that the FTC orders provide adequate circumstantial evidence to prove that the calls to Ms. Mey were made with the intent of the Defendants' alter ego companies to commit fraud and went further to find that the callers were substantially certain that harm would result from their fraudulent debt relief services, Ms. Mey would not have satisfied her burden of proof as to the robocall debt. She still would not have shown that the callers intended that the acts of robocalling would injure Ms. Mey or that callers could be substantially certain that merely by calling Ms. Mey, she would be injured by fraud. Any injury from the robocalls would be an incidental and unintended consequence of actions taken in furtherance of fraud.

Fraud, if it were committed, and the unsolicited robocalls are distinct acts with distinct injuries. Typically, fraud results in harm by virtue of the defrauded individual paying money to the person committing the fraud. Ms. Mey could be correct that the goal of the callers (and the Defendants by virtue of the alter ego finding) was to fleece her out of money by selling her worthless and unneeded debt relief services. In that case, any intended harm would be the loss of money spent on fraudulent debt relief service. Even if we assume that harm in the nature of harassment or invasion of privacy can be inferred from the robocalls, there is no evidence to support the idea that the callers intended to cause that harm by making the calls – as compared to the failed attempt to cause harm by virtue of a fraud scheme.

Ms. Mey has offered no support for her argument that an alleged intent to commit a different act and cause a different injury (which were neither committed, nor caused) is relevant to the question of whether any robocall-caused injury was deliberate and intentional.

### b. The Requisite Intent Is Intent to Cause the Injury Reflected in the Debt

The debt in this case is for violation of strict liability federal and state statutes prohibiting robocalls, and any injury reflected by the debt is any injury that may be inferred to have been caused by Ms. Mey's receipt of the robocalls. Ms. Mey argues that it is sufficient for § 523(a)(6) that she show that the Defendants intended to commit fraud.

Under Ms. Mey's argument, intent may be removed from the injury that gives rise to the debt at issue in a § 523(a)(6) claim. Her argument does not align with the clear language of the statute – "debt for willful and malicious injury" – and the Supreme Court's interpretation that "willful" modifies "injury"

and requires the existence of "a deliberate or intentional injury." *Geiger*, 523 U.S. at 61.

Unintended injuries stemming from an intentional act are outside the scope of § 523(a)(6). *Panalis v. Moore* (*In re Moore*), 357 F.3d 1125, 1128 (10th Cir. 2004). "'[F]or willfulness and malice to prevent discharge under § 523(a)(6), the debtor must have intended the actual injury that resulted' and not just performed an intentional act that resulted in injury." *Miller v. J.D. Abrams Inc.* (*Matter of Miller*), 156 F.3d 598, 603 (5th Cir. 1998) (quoting *Corley v. Delaney* (*In re Delaney*), 97 F.3d 800, 802 (5th Cir. 1996)). "Most courts interpreting *Geiger* have found that willfulness requires that the act have been 'voluntary', and 'deliberate or intentional' and must have been directed to causing the 'injury' which is the focus of the § 523(a)(6) action." *Marvin v. Larson* (*In re Larson*), No. ADV 08-1214, 2009 WL 2144079, at *5 (D.N.J. July 14, 2009) (citing *In re Whiters*, 337 B.R. 326, 334–37 (Bankr. N.D. Ind. 2006)).

It would be inconsistent with the statute and Supreme Court guidance to allow the alleged plan and intent to cause an injury by fraud, which was not committed or incurred, to form the intent to cause an injury of harassment or invasion of privacy by robocalling. Also, it would render pointless the higher standard in § 523(a)(6) if a party could always satisfy that subsection by simply satisfying the somewhat lower standard in § 523(a)(2) relating to fraud. The approach argued by Ms. Mey would eliminate the need for separate subsections of the dischargeability provisions if it could be that easy to bootstrap one standard to the other.

Since Ms. Mey was not injured due to fraud, any fraudulent intent by the Debtors is immaterial to whether the injuries resulting from robocalls in this case were willful. *See Moore*, 357 F.3d 1125 (holding that although the debtor intentionally committed fraud by misrepresenting his insurance coverage, it did

not follow that debtor made the false representation with the intent that the plaintiff would suffer physical injury, which was only incidental to the fraud).

### c. Intent to Injure by Making the Robocalls

At trial, Ms. Mey needed to prove that the Defendants intended to cause Ms. Mey harm by the act of robocalling or that the Defendants were substantially certain that harm would result from such calls. The intent element is tied to the injury actually incurred and that gives rise to the debt. *See Miller*, 156 F.3d at 603.

Although Ms. Mey did not argue that the Defendants intended that the robocalls themselves would injure her, any effort to pursue that approach would have been futile based on the evidence that was presented.

There were approximately 104 calls included in the Judgment debt. While the total number of calls may seem large, the average number over a three-year period is not sufficient to demonstrate an intent to harass, especially since a fair number were follow-up calls that Ms. Mey invited.

Approximately 20% of the calls were follow-up calls made to Ms. Mey with her express or implied consent based on her feigned interest. Her memorandum on which the Judgment was based reflects that she excluded from the Judgment calculations a couple of calls that followed her express consent, but not all calls that immediately followed Ms. Mey engaging with the callers, feigning interest, and not instructing them not to call again. For example, some calls were dropped, and Ms. Mey reengaged with the caller when they called back. It can hardly be inferred that the callers intended to harm Ms. Mey with a follow-up call that she was willing to receive. Ms. Mey has not attempted to exclude any such calls from her § 523(a)(6) claim or distinguish between the effect of unsolicited calls versus those that she invited or showed a willingness to receive.

Any intent to injure Ms. Mey specifically is further abated by the fact that Ms. Mey used at least three pseudonyms with the callers. From the callers' perspective, they were calling four different people and not placing all 125 calls to Ms. Mey. Again, the volume of calls must be viewed in context since this was not a situation where the calls at issue were all directed at a single potential customer named Diane Mey contrary to her wishes. She posed as different people at various times using fake names and sometimes invited follow-up discussions as she attempted to bolster her evidence for future lawsuits against telemarketing companies. Under these circumstances, the Court cannot find that the volume alone reflects an intent to cause harm.

The companies or their agents continued making calls after Ms. Mey asked them to stop calling and after she filed suit against them. These facts may demonstrate that someone was sloppy, negligent, or reckless in failing to comply with applicable laws and/or ensuring that call center agents were complying with applicable laws, but they do not show a subjective intent by the Debtors or alter ego companies to cause Ms. Mey harm. Likewise, that fact alone does not prove subjective knowledge by the Debtors or alter ego companies of the substantial likelihood that harm would result from the calls.

Finally, Ms. Mey argues that some of the allegations in her West Virginia complaint about harassing or deceptive intent are deemed admitted and indicative of intent. They were deemed admitted in the West Virginia Litigation by virtue of the sanction stripping the defendants of their defenses and the entry of default, but that does not mean that they are preclusive in this proceeding. For collateral estoppel to apply, any findings of fact must be necessary or essential to the Judgment. *Berge*, 953 F.3d at 917 (citing *Wolfe v. Perry*, 412 F.3d 707, 716 (6th Cir. 2005)); *State v. Miller*, 459 S.E.2d 114, 120 (W. Va. 1995). The Judgment was based on strict liability sections of the applicable statutes, not any intent- or call-content-based provisions. None of the "deemed admitted"

allegations about the callers' intent or the content of the calls were relevant or necessary to the Judgment.

Ms. Mey has not met her burden of proving that anyone – the Debtors or their alter ego companies – intended to injure her by the acts of robocalling that provide the basis for the Judgment debt. Any injury that may be inferred from the Judgment debt was incidental and thus outside the scope of § 523(a)(6).

### 3. Maliciousness

Ms. Mey must also prove that any injury she suffered was malicious. While there was no actual injury in this instance, the West Virginia Judgment established a debt for which harm is inferred by virtue of the statutorily imposed damages. Even if the "injury" is inferred or hypothetical, the malicious element must be present to have any chance of fitting under § 523(a)(6).

A malicious injury occurs when a person acts "in conscious disregard of one's duties or without just cause or excuse." *Berge*, 953 F.3d at 920 (quoting *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)). Unlike willful conduct, malicious conduct does not require a specific intent to harm, personal hatred, spite, or ill will. *Id.* at 915 (citations omitted). However, it still requires more than negligence or recklessness. *Rice v. Morse* (*In re Morse*), 504 B.R. 462, 475 (Bankr. E.D. Tenn. 2014) (citing *W. Mich. Cmty. Bank v. Wierenga* (*In re Wierenga*), 431 B.R. 180, 185 (Bankr. W.D. Mich. 2010)). "[K]nowledge that legal rights are being violated is insufficient to establish malice...." *Id.* (quoting *Steier v. Best* (*In re Best*), 109 Fed. Appx. 1, 6 (6th Cir. 2004)).

Ms. Mey has not shown that the Defendants made or caused all of the calls to be made in *conscious* disregard of the law. At best, the general evidence supports a finding that the Defendants' alter ego companies allowed the calls to continue after Ms. Mey asked the callers to stop calling and after Ms. Mey filed suit. Although this may have happened through mere negligence or

recklessness rather than a conscious disregard, the Court can infer that there was a level of consciousness that existed after the telemarketing companies were accused of improper conduct in the West Virginia Litigation but apparently took no action to stop it. To the extent any malice of the Defendants' alter ego companies applies to the Defendants, which the Court does not need to determine as explained below, the malicious element may be shown for some of the calls occurring during part of the relevant time period.

The inference of conscious disregard cannot apply across the board as Ms. Mey would argue. As earlier noted, some of the calls included in the Judgment damage award were invited by Ms. Mey or made with her consent. Ms. Mey's consent provides "just cause or excuse" for those return or follow-up calls. Once she revoked her consent and asked that she not be called again, subsequent calls were made without just cause.

Ms. Mey did not attempt to distinguish between the originating and follow-up calls as reflected in the damages award in the Judgment. She has not shown what portion of the Judgment related to "malicious" calls versus those made with just cause or excuse. Therefore, she has failed to prove by a preponderance of the evidence that all or any specific portion of the Judgment reflects debt caused by "malicious injury."

Throughout these proceedings, Ms. Mey has taken an "all or nothing" approach to the litigation and the "willful and malicious" nature of the Judgment debt. No effort was made to prove that certain amounts of the Judgment should be excepted from discharge even if the full amount is not. That is true on issues such as "conscious disregard" versus "just cause" in the maliciousness analysis.

The Court concludes that it does not have sufficient evidence to determine what portion of the Judgment award for violation of the TCPA and/or the

WVCCPA could be attributable to malicious versus non-malicious calls. Additionally, given that the Court has already found that Ms. Mey has not satisfied her burden of proof on the willfulness element, any effort at distinguishing malicious versus non-malicious Judgment debt would be pointless since a finding of maliciousness cannot stand alone under § 523(a)(6) but must be coupled with a finding of willfulness.

### 4. "By the Debtor"

For debt to be excluded from discharge pursuant to § 523(a)(6), it must be for "injury by the debtor." In this case, there is no direct evidence that Ms. Mey's statutory "injury" relating to the Judgment debt was caused by the Defendants. The Defendants were not the persons calling Ms. Mey. There was no evidence that they instructed the persons that called Ms. Mey or that they were in positions of control over those persons.[12] Likewise, there is no evidence in the record that Defendants set the applicable company's policies and practices relating to telemarketing calls or, specifically, robocalls. There is also no evidence that the Defendants knew the robocalls to Ms. Mey continued after Ms. Mey filed suit. Finally, the allegations in Ms. Mey's West Virginia complaint that may have supported the West Virginia Court's alter ego finding are conclusory in nature and essentially state the legal standard without including any specific allegations about the Defendants' control or intent with respect to the robocalls.

Ms. Mey relies entirely on the West Virginia Court's finding by default that the companies responsible for the calls to Ms. Mey were the Defendants'

---

[12] There is evidence that various persons calling Ms. Mey represented that they were calling on behalf of Tristar Consumer Law, which is a company formed by Mr. Phillips, and at least one caller represented that he was calling on behalf of Tristar Consumer Group, which was owned by Mr. Thompson. Without additional evidence to show that Mr. Phillips and Mr. Thompson exercised control over the callers, the Court cannot conclude that the calls were "by the debtor," without considering the legal effect of the West Virginia Court's alter ego finding.

alter egos. Prior to trial, the parties hotly debated whether the West Virginia Court's finding is sufficient to show that the calls were "by the Debtors" and whether any intent by the alter ego companies translated into the intent of the Debtors.

It is generally accepted that in situations of vicarious liability, the actions and intent of an agent cannot be imputed to a debtor principal for purposes of § 523(a)(6). *See Cocoma v. Nigram* (*In re Nigam*), No. AP 14-1574, 2018 WL 3768990, at *10 (10th Cir. BAP (Colo.) Aug. 9, 2018) (finding this to be the "prevailing view"), aff'd, 780 F. App'x 559 (10th Cir. 2019); *see also Huffman v. Holden* (*In re Hughley*), No. 17-41946, 2019 WL 2402852, at *5 (Bankr. N.D. Ohio June 5, 2019) ("[T]his Court believes that under the precedent established by the Supreme Court in *Kawaauhau* and by the Sixth Circuit in *Markowitz*, for the debt to be nondischargeable under § 523(a)(6), the conduct must be the result of willful and malicious conduct by the debtor, such as the debtor directing someone to injure another person."); *Thatcher v. Austin* (*In re Austin*), 36 B.R. 306, 311-12 (Bankr. M.D. Tenn. 1984) (refusing to impute intent through vicarious liability because "application of vicarious liability would effectively vitiate the § 523(a)(6) requirement that only debts resulting from willful acts committed by the debtor be nondischargeable"). With vicarious liability, it is understood that the agent and principal are different persons.

However, in an alter ego scenario, a corporate entity and an individual are typically deemed as a matter of law to be one and the same, and liability is not considered vicarious but direct. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005).

Courts differ as to the appropriate analysis or approach for § 523(a)(6) purposes when liability is based on a finding of alter ego. At least one court analyzing the issue has held that alter ego liability under the § 523(a)(6) standard still requires impermissible imputing of action and intent to a debtor.

*Moss v. Gurbacki* (*Matter of Gurbacki*), No. AP 21-8001, 2021 WL 1216542, at *4 (Bankr. D. Neb. Mar. 30, 2021). Without analyzing whether intent would be imputed in an alter ego scenario, other courts make or reference the alter ego finding but then clearly consider additional facts that show action, control and intent of the debtor for § 523(a)(6). *See, e.g., Campos v. Beck* (*In re Beck*), No. 4:11-BK-06633-JMM, 2012 WL 2127751, at *3–4 (Bankr. D. Ariz. June 11, 2012); *The Ward Family Found.* (*In re Arnette*), 454 B.R. 663, 700 (Bankr. N.D. Tex. 2011); *S. Atlanta Neurology and Pain Clinic, P.C. v. Lupo* (*In re Lupo*), 353 B.R. 534, 551 (Bankr. N.D. Ohio 2006).

These issues have become inconsequential in this case based on the evidence presented at trial, because Ms. Mey failed to prove other essential elements of her § 523(a)(6) claim: that any injury was both "willful and malicious." She did not prove that either the Defendants or their alter ego companies had the intent to cause her injury by making the robocalls. She also failed to show that all the calls were made in conscious disregard of duties or without just cause or excuse.

The Court need not determine the interesting and challenging legal issues tied to the application of an alter ego finding in the context of the intent element of § 523(a)(6). It is unnecessary to reach a conclusion about how to reconcile the normal results of an alter ego finding with the emphasis on individual intent required in § 523(a)(6). It is adequate for a determination in this case to say simply that (a) if proof of individualized subjective intent of Mr. Phillips and Mr. Thompson is required, Ms. Mey offered no proof to support such a finding, and (b) to the extent the alter ego finding is enough to saddle the Defendants with the intent of any of their alter egos, there is insufficient proof of such requisite intent on the part of any of those alter egos as well.

### 5. Conclusion

Because Ms. Mey has not shown that any inferred injury from her receipt of the robocalls was "willful" or that all the calls were made maliciously, without just cause or excuse, her claim that the Judgment debt be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(6) is denied.

### B. 11 U.S.C. § 727(a)(4)(A)

Ms. Mey seeks a denial of Mr. Phillips' and Mr. Thompson's discharges under 11 U.S.C. § 727(a)(4)(A) based on their failure to disclose all interests in and significant connections with businesses in the four years preceding their bankruptcy filings as required by their statements of financial affairs ("SOFA").

An individual Chapter 7 debtor is entitled to a discharge unless, among other reasons, "the debtor knowingly and fraudulently, in or in connection with the case … made a false oath or account[.]" 11 U.S.C. § 727(a)(4)(A). "'Complete financial disclosure' is a prerequisite to the privilege of discharge." *Keeney*, 227 F.3d at 685 (quoting *Peterson v. Scott* (*In re Scott*), 172 F.3d 959, 967 (7th Cir. 1999)) (additional citations omitted).

For denial of discharge to be warranted under § 727(a)(4)(A), "a plaintiff must prove by a preponderance of the evidence that: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." *Id.* (citations omitted). Whether a debtor has made a false oath in violation of this section is a question of fact. *Id.*

A debtor knows a statement is false when "the debtor [knows] the truth, but nonetheless fail[s] to give the information or [gives] contradicting information." *Ayers v. Babb* (*In re Babb*), 358 B.R. 343, 355 (Bankr. E.D. Tenn.

2006) (quoting *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (6th Cir. BAP 1999)).

Fraudulent intent under § 727(a)(4) means "actual fraud, … which looks to a defendant's subjective state of mind at the time of the transaction in question." *U.S. Trustee v. Halishak (In re Halishak)*, 337 B.R. 620, 6227 (Bankr. N.D. Ohio 2005) (citation omitted). Recklessness as to whether a statement is true satisfies the intent requirement. *Keeney*, 227 F.3d at 686. However, if false information is provided due to mistake or inadvertence, the requisite intent is lacking, and a debtor is entitled to discharge. *Id.; see also Roberts v. Oliver (In re Oliver)*, 414 B.R. 361, 374–75 (Bankr. E.D. Tenn. 2009) ("[A] false statement resulting from ignorance or carelessness does not rise to the level of 'knowing and fraudulent.'").

Fraudulent intent may be "deduce[d] … from all the facts and circumstances of a case." *Keeney*, 227 F.3d at 686 (citation omitted). A series or pattern of errors and omissions may be indicative of fraudulent intent, in the absence of a credible explanation to the contrary. *Halishak*, 337 B.R. at 627. "A debtor who fails to provide plausible explanations for misstatements or omissions makes it more likely a factfinder will infer intent to deceive." *Vara v. Motil (In re Motil)*, No. 22-10571, 2023 WL 187156, at *11 (Bankr. N.D. Ohio Jan. 13, 2023).

Materiality is established when a statement "'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *Keeney*, 227 F.3d at 686 (quoting *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)). This is considered a low bar. *Carter-Jones Lumber Co. v. Beatty (In re Beatty)*, 583 B.R. 128, 139 (Bankr. N.D. Ohio 2018).

Once the plaintiff has presented a *prima facie* showing of all elements of a § 727(a)(4) claim, the burden of production shifts to the debtor defendant to provide a credible explanation for his actions. *Halishak*, 337 B.R. at 626. The plaintiff retains the overall burden of persuasion to establish the elements for denial of discharge by a preponderance of the evidence. *Id.*

The Court is required to construe an action to deny the debtor a discharge "liberally in favor of the debtor and strictly against the party seeking denial of discharge." *McDermott v. Capra* (*In re Capra*), No. 15-15907, 2016 WL 5106994, at *6 (Bankr. N.D. Ohio Sept. 19, 2016) (citing *Keeney*, 227 F.3d at 683). However, the Court is also mindful that "the very purpose" of § 727(a)(4) is to ensure "that those who seek the shelter of the [B]ankruptcy [C]ode do not play fast and loose with their assets or with the reality of their affairs." *McDermott v. Wise and Wise v. Wise* (*In re Wise*), 590 B.R. 401, 429 (Bankr. E.D. Mich. 2018) (quoting *Robin Singh Educ. Servs., Inc. v. McCarthy* (*In re McCarthy*), 488 B.R. 814, 825 (B.A.P. 1st Cir. 2013)) (additional citations omitted).

In this case, it is undisputed that the Defendants made false statements in their SOFAs under oath, thus satisfying the first two elements. Looking at the last element, materiality is satisfied by the omitted information relating to the Defendants' business interests.

The contested elements are whether the Defendants knew the statements were false when made and whether the Defendants acted with fraudulent intent.

### 1. Background Facts

As background, Ms. Mey claims Mr. Phillips and Mr. Thompson have shown a pattern of failing to disclose all business interests under oath because they were sanctioned for that very reason in the West Virginia Litigation. Indeed, it was the harsh sanctions for failure to fully and accurately disclose

business information in the West Virginia Litigation that resulted in the predicament the Defendants are in now. The West Virginia Court struck the Defendants' defenses based in part on the following background and findings:

> In discovery, Ms. Mey sought to explore defendants' interrelationships to prove her alter ego and joint venture claims, as well as her contention that piercing the corporate veil was appropriate. Among other items, Ms. Mey requested all documents reflecting defendants' interest, affiliations, officer status or ownership in any entities named herein or in which another defendant also shared interest, affiliation, officer status or ownership. Plaintiff also requested that defendants identify other lawsuits in which they/their entities had been involved. She further requested that the defendants identify all investigations by any state or federal government agency into acts by defendants or any entities in which they held officer status, interest, or ownership and all documents sent to or from any state attorney general or other government entity against defendant(s) or any entity in which defendant(s) had interest, affiliation, ownership, or officer status.
>
> This Court finds that the defendants did not answer forthrightly, but concealed many lawsuits, investigations, and other discoverable material including financial and corporate records. In ruling upon a prior motion to compel in this case, Magistrate Judge Mazzone noted many of the same evasive tactics defendants continue to attempt. [Doc. 51].
>
> Magistrate Judge Mazzone determined that Mr. Phillips had not provided information as to the various interrelationships between the organizations as requested; had answered only in the present tense when the past tense was also requested; had failed to answer according to the instructions which included all listed entities rather than just his personal knowledge; improperly narrowed his answers to "officers" only; failed to provide historical information as requested; and improperly narrowed his answers to those in which he had officer status, rather than all those in which he had affiliation or interest as requested. Magistrate Judge Mazzone deemed these answers incomplete.

(Memorandum Opinion and Order Granting Plaintiff's Motion for Sanctions; Ex. 1045 at 3-4.) Although the sanction was granted against both Defendants, in

addition to other defendants in the West Virginia Litigation, the West Virginia Court primarily referred to discovery failings by Mr. Phillips in the preceding and other sections of the order.

## 2. § 727(a)(4)(A) Claim Against Judson Phillips

The SOFA form at Question 27 requires debtors to disclose whether within the four years prior to filing bankruptcy, the debtor owned a business or had certain connections to any business, including, among other things, being sole proprietor or self-employed, a member of an LLC, or an officer, director, or managing executive of a corporation.

Ms. Mey complains that Mr. Phillips did not disclose his ownership interest or officer or director positions in several companies: Consumer Debt Advocates, Inc.; Counterpart Capital; and Capital Compliance Group, Co.[13]

First, Mr. Phillips did not disclose in his original or amended SOFA that he served as Secretary and Director of Consumer Debt Advocates, Inc., according to the business records of the state of New Mexico where the company was incorporated. Mr. Phillips was sanctioned in the West Virginia litigation for failing to disclose his affiliation with Consumer Debt Advocates and other companies. Mr. Phillips defended his omission of this company from his SOFA by claiming the company was started by a business associate and he did not know if he had any ownership interest in the company. He said he did not think

---

[13] Ms. Mey also alleged that Mr. Phillips failed to disclose litigation that had been pending against him in the year preceding his bankruptcy filing as required by SOFA Question 9. As for the West Virginia Litigation, Mr. Phillips included Ms. Mey and the West Virginia Judgment on his Schedule F but failed to add the litigation to his SOFA. The Court finds this attributable to a mistake, with no fraudulent intent. As for the allegation that Mr. Phillips failed to disclose unrelated litigation styled *Fuentes v. Enhanced Recovery Servs. 2*, Ms. Mey failed at trial to present any admissible evidence about that litigation, including whether Mr. Phillips knew of the litigation and knowingly omitted it from his response.

the company had ever conducted any business or that he had ever received any compensation from the company.

Second, Ms. Mey complains that Mr. Phillips publicly represented in his LinkedIn profile that he has been the CEO of Counterpart Capital since March 2022, but he did not disclose this business or this position in his SOFA. Mr. Phillips admitted that Counterpart Capital was his unincorporated business, and he stated that his plan was to connect businesses seeking financial funding with business lenders for a fee. He said he never generated any such business, and the only money he invested was to purchase a domain name, but he never went on to set up website.

Posts Mr. Phillips made on his LinkedIn account show that he was at least attempting to generate business for Counterpart Capital in the year before he filed his bankruptcy petition and SOFA. The lack of incorporation of Counterpart Capital does not excuse Mr. Phillips from disclosing this business. Petition Part 1, Question 2 requires the debtor to list all other names used in the last 8 years, including "any assumed, trade names and doing business as names." Additionally, Petition Part 3, Question 12 and SOFA Question 27 both require the identification of sole proprietorships. These are three different questions that should have prompted Mr. Phillips to disclose Counterpart Capital.

Finally, Ms. Mey complains that Mr. Phillips failed to disclose his positions with and interest in Capital Compliance Group, Co. This non-disclosure is even more troubling.

Mr. Phillips incorporated Capital Compliance Group, Co. in July 2018, and he has signed annual reports as Manager (reporting year 2018), President (2019), and CEO (2020). In the 2020 Annual Report filed in February 2021, Mr. Phillips also identified himself as the Director. Ms. Mey introduced pages

from Mr. Phillips' LinkedIn account in which he represents himself to be the CEO of Capital Compliance Group, Co. from July 2018 – March 2022. She also introduced a video that was posted on YouTube and on the Capital Compliance Group website in which Mr. Phillips was interviewed about the business. In the video, Mr. Phillips represented himself to be the CEO and he described what prompted him to start the business and what the business does. Although it was not expressly stated that Mr. Phillips had an ownership interest in Capital Compliance Group, Co., his interest can be inferred from the fact that he admitted to devising the business idea and starting the company, and he did not deny having any ownership interest.

Unlike the other non-disclosed businesses, Capital Compliance Group, Co. was an active business. Mr. Phillips testified that it did not make "much profit" any year, thus implicitly admitting that the company did make some profit.

Mr. Phillips' affiliations with Consumer Debt Advocates and Capital Compliance Group were known to Ms. Mey prior to Mr. Phillips' bankruptcy due to the West Virginia Litigation. Capital Compliance Group was a co-defendant in that litigation, and one of the defendants with whom Mr. Phillips shares joint and several liability for the Judgment. In the West Virginia Litigation, Ms. Mey had accused Mr. Phillips of omitting his positions as Secretary and Director with Consumer Debt Advocates from his discovery responses, and she had won default sanctions for that reason, among others.

Mr. Phillips scheduled the West Virginia Judgment debt to Plaintiff, so he knew this large creditor and her counsel would receive notice of his bankruptcy case. He also maintained a high public profile of his affiliation with Capital Compliance Group. Therefore, it is not believable that Mr. Phillips was actively trying to hide his affiliations with Consumer Debt Advocates and

Capital Compliance Group by not including them in his SOFA. He could not reasonably have believed his affiliations would remain hidden.

However, Mr. Phillips' excuse for the non-disclosure is unconvincing. He said he did not know why he did not think of Capital Compliance Group when preparing the SOFA. He likened it to looking all around for your glasses only to discover they are on your head. Mr. Phillips also claimed he had suffered a concussion approximately six months before he filed bankruptcy, and he suffered headaches and memory loss for several months after the concussion. Complaining of concussion symptoms six months after the fact seems more self-serving than credible. The Court did not find this excuse convincing.

Mr. Phillips has a law degree, and he practiced law for 30 years until he was disbarred in 2018. Having been a practicing lawyer, Mr. Phillips should have understood the severe consequence he suffered for not fully disclosing all business interests in the West Virginia Litigation (i.e., the entry of default leading to a significant damage award). The fact that the West Virginia Court specifically identified Mr. Phillips' failure to make similar business-related disclosures in the West Virginia Litigation evidences a pattern and practice of non-disclosure.

As a former lawyer, Mr. Phillips also understood well the requirement to give "true and correct" answers to the questions on his SOFA under penalty of perjury. The applicable standard for truthfulness in sworn bankruptcy filings is the same for a lawyer debtor as for a non-lawyer debtor. However, Mr. Phillips' law degree is relevant when evaluating the credibility of his excuses and his state of mind for "intent to deceive."

The Court considers Mr. Phillips' omission of his interests in or roles with Consumer Debt Advocates, Inc., Counterpart Capital, and Capital Compliance Group, Co. to evidence a cavalier attitude toward his bankruptcy disclosures.

This is especially true as to Counterpart Capital and Capital Compliance Group, Co., which Mr. Phillips was actively promoting on his LinkedIn account at or around the time of his bankruptcy filing.

The upshot is that we have a lawyer who had recently been heavily penalized by the West Virginia Court for failing to disclose his business interests, and he filed bankruptcy for the very purpose of avoiding that Judgment. Even if Mr. Phillips was not consciously attempting to mislead anyone with the financial and business information contained in his bankruptcy filings, his omissions demonstrate that he was acting in such an unconcerned, apathetic, and indifferent manner that he did not care about the accuracy and completeness of the type of information that got him into trouble in the first place.

Mr. Phillips' omission of the businesses he was actively engaged in at the time of his bankruptcy filing shows a reckless disregard for the accuracy of his bankruptcy schedules and SOFA. This satisfies the requisite intent element. *See Keeney*, 227 F.3d at 686. To find otherwise would send a message that bankruptcy is not a serious undertaking, that it is fine to make misrepresentations in sworn statements, and that there are no consequences for failing to respect the bankruptcy process.

The trustee and creditors were deprived of the opportunity to examine Mr. Phillips' interests in these businesses for any value to the bankruptcy estate. Based on Mr. Phillips' knowing and fraudulent omission of the businesses from his sworn bankruptcy schedules and SOFA, he is denied discharge pursuant to 11 U.S.C. § 727(a)(4)(A).[14]

---

[14] Mr. Phillips amended his statement of financial affairs on May 17, 2024, five months after Plaintiff filed her Complaint in this proceeding and the deadline for other parties to object to discharge had expired. His amendment again omitted all three business interests, showing a continued reckless disregard for the truth. *See Beaubouef*, 966 F.2d at 178 (footnote omitted) (citation omitted) (holding that the bankruptcy court's findings "that the existence of more than

### 3. § 727(a)(4)(A) Claim Against John Preston Thompson

Mr. Thompson also failed to disclose all business ownership and connections in his bankruptcy filings. Mr. Thompson attached a list of 17 business entities to his Schedule A/B in response to the questions: "Do you own or have any legal or equitable interest in any business-related property[, specifically, any] [i]nterests in partnerships or joint ventures." (Questions 37 and 42). Including an additional company identified on the schedule form itself, Mr. Thompson identified 18 business entities. He incorporated this information by reference in response to SOFA Question 27 about his ownership or certain significant connections to businesses in the four years prior to filing bankruptcy. Mr. Thompson testified that he had compiled the list of businesses in response to a request by the FTC not long before filing bankruptcy. He thought that he had compiled an accurate list for the FTC, so he used the list when supplying information for his bankruptcy case.

Approximately six weeks after Ms. Mey filed her complaint against Mr. Thompson, Mr. Thompson amended his SOFA and schedules to include nine additional business entities in which he had an ownership interest. According to Mr. Thompson, six of those companies were merely incorporated and never commenced business operations. That left three entities: Integrity Solutions Group, LLC, SPMJ, Inc., and Heist Holdings, LLC.

---

one falsehood, together with [the debtor's] failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed his amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent to deceive [under § 727(a)(4)(A)]" were "supported by the record and are not clearly erroneous"), *quoted in McDermott v. French* (*In re French*), 592 B.R. 653, 658 (Bankr. E.D. Mich. 2018). Two weeks after trial, Mr. Phillips amended his statement of financial affairs again to include his interests in Consumer Debt Advocates and Capital Compliance Group. This incredibly late amendment cannot cure the prior fraudulent omissions. *See McDermott v. Kerr* (*In re Kerr*), No. 15-30531, 2017 WL 3880875, at *17 n. 21 (Bankr. N.D. Ohio Aug. 30, 2017).

Mr. Thompson sold his ownership interest in Integrity Solutions Group, LLC, for a nominal amount more than three years before he filed bankruptcy, and he testified that the business had not been profitable prior to the sale.

He had an ownership interest in SPMJ, Inc., and he was identified in the 2018 incorporation filings as the CFO.[15] SPMJ was administratively dissolved in September 2022. Mr. Thompson credibly testified that it was inactive, and it had no assets at the time of dissolution. Ms. Mey's evidence that Mr. Thompson directed or approved the transfer of $50,000 from his company, Music City Ventures, to SPMJ in November 2020 does not serve to contradict Mr. Thompson's statement that as of its dissolution two years later, the company had no assets.[16]

Heist Holdings, LLC was incorporated in April 2021 and administratively dissolved in September 2023. Mr. Thompson had an ownership interest in the business until March 2022, and he was identified as a manager in the corporate filings. Mr. Thompson testified that Heist Holdings related to a pre-existing, "antiquated" restaurant in Florida that Mr. Thompson had intended to modernize in partnership with others. They never modernized the restaurant, and Mr. Thompson testified that he sold his interest because the business never made any money. The sale was two and a half years before Mr. Thompson filed bankruptcy.

Unlike Mr. Phillips' omissions, Mr. Thompson was not playing an active role in any of the undisclosed corporate entities at the time of his bankruptcy filing, and in fact, most of the entities never conducted any business.

---

[15] Mr. Thompson has no accounting training.

[16] Ms. Mey presented no other admissible evidence to the contrary. Her counsel directed the Court to a memorandum of law she filed in the West Virginia Litigation in which she summarized her review of bank records, which she claimed showed monetary transfers from Mr. Thompson's company, Music City Ventures, to a couple of the business entities Mr. Thompson omitted from his bankruptcy filings. All of this evidence is inadmissible hearsay.

Mr. Thompson testified that six of the entities that he had omitted from his original statements and schedules were formed by business associates, but never engaged in any business. The business associates identified Mr. Thompson as an officer or director on the incorporation filings with his general permission, but not necessarily his actual knowledge. These businesses never progressed past the proposal stage. The Court found Mr. Thompson credible when testifying that he was not aware that he had been designated an officer or director of these entities. Because the businesses never developed, it is understandable that Mr. Thompson did not think to disclose them in his bankruptcy filings. An honest mistake is not cause for denial of discharge. *Keeney*, 227 F.3d at 686; *Oliver*, 414 B.R. at 374–75.

Although Integrity Solutions, SPMJ, and Heist Holdings were once active businesses, Mr. Thompson testified that they were not profitable and he either shut down the business or transferred his interest at least two years before he filed bankruptcy. While these businesses should have been more memorable to Mr. Thompson than the businesses that never developed, the Court believes the omissions were also the result of mistake, and not knowing or fraudulent.

Ms. Mey argues that Mr. Thompson should have known about all of the omitted business entities at the time of his bankruptcy filing because she had complained to the West Virginia Court about Mr. Thompson's failure to disclose the entities in response to discovery and that failure led to the entry of default sanctions against Mr. Thompson. The Court found Mr. Thompson credible when testifying that he relied on his lawyer in the West Virginia Litigation, he had very limited contact with the lawyer, he believed he provided accurate information to his lawyer's staff, and he did not know the details of the sanction and basis for it.

When the omissions were called to his attention by Ms. Mey's complaint in this case, Mr. Thompson promptly amended his schedules and SOFA to

include the previously omitted businesses. An amendment would not cure a fraudulent omission in the original filings, and the post-complaint timing of Mr. Thompson's amendment may entitle it to less weight. *See Kerr*, 2017 WL 3880875, at *17 n 21. However, the Court found no such fraudulent intent in the original filings. The Court finds Mr. Thompson's prompt amendment indicative of his respect for the bankruptcy process and intent to provide full disclosure. The Court also notes that the amendment was made well within the time-period for the Chapter 7 Trustee and the U.S. Trustee to object to Mr. Thompson's discharge, and they chose not to do so.

Since Mr. Thompson's SOFA omissions were not made knowingly or fraudulently, he will not be denied discharge pursuant to § 727(a)(4)(A).

## III. CONCLUSION

For the reasons stated, Ms. Mey's claim that the Judgment debt be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(6) is denied. Ms. Mey's claim that Mr. Thompson be denied discharge pursuant to 11 U.S.C. § 727(a)(4)(A) is also denied. Her claim that Mr. Phillips be denied discharge pursuant to § 727(a)(4)(A) is granted.

Appropriate orders will be entered in both adversary proceedings.

-